LAGESEN, J.
*653 *419 As Doug Kelley neared the end of his 14-year career as a lumber sales trader for Pelican Bay Forest Products, Inc. (Pelican Bay or plaintiff)-the plaintiff in this case-he gave his son-in-law, Andrew Hotmer, a portion of his Pelican Bay customer list, along with other information about those customers and their business with Pelican Bay. Hotmer, with Kelley's assistance, parlayed that information into a timber sales job with one of Pelican Bay's competitors, Western Timber Products, Inc. (Western Timber). In that job, he used Kelley's customer information to make sales on behalf of Western Timber-something that, according to Pelican Bay, diminished its own sales and profits. That led to this lawsuit. Pelican Bay claims that, as a result of that course of events, Western Timber, its president, Seid, and Hotmer (collectively, defendants) have (1) misappropriated trade secrets belonging to Pelican Bay, in violation of ORS 646.461(2) ; and (2) intentionally interfered with Pelican Bay's economic relations. Defendants moved for summary judgment, and the trial court granted the motion, concluding that there was insufficient evidence to permit a reasonable factfinder to find in Pelican Bay's favor on certain elements of its claims. It then awarded attorney fees to defendants on the trade secrets claim, as allowed by ORS 646.467(1), concluding that Pelican Bay's claim of misappropriation was made in bad faith. We conclude that there are genuine issues of material fact on those claims and, accordingly, reverse and remand.
FACTS
This case was hard fought in the trial court, and the summary judgment record contains conflicting evidence on a number of points. However, our standard of review, discussed below, requires us to view the facts in the light most favorable to Pelican Bay, the nonmoving party. We therefore state the facts accordingly.
Pelican Bay serves as a distributor between lumber mills and purchasers of their products. Kelley started working as a lumber sales trader for Pelican Bay in or around 2000. Kelley acted as an intermediary between lumber mills selling products and customers who desired to purchase *420 those products. Kelley built rapport with customers, determined their product needs, and then located and sold them that product. He had done similar work before working for Pelican Bay but did not bring a customer base with him. Rather, Pelican Bay provided him with customer information and accounts serviced by former Pelican Bay traders. That customer information consisted of customer names, contact persons, product preferences, mill information, pricing, customer payment information, shipping preferences, and costs. Over the 14-year course of his employment with Pelican Bay, Kelley's customer base grew to include roughly 40 nationwide customers.
In 2007, Kelley signed an "Employee Acknowledgment" in which he agreed to abide by the policies contained in Pelican Bay's employee handbook. The handbook contained a "Confidentiality Policy" stating that plaintiff's confidential proprietary information, including plaintiff's customer list and "all information obtained by company employees during the course of their work," belonged to plaintiff and was not to be shared with third parties, "except as your job requires."
Notwithstanding that policy, and his written acknowledgment of it, Kelley attempted to sell his customer list to other Pelican Bay traders in 2013. Around the same time, Kelley also contacted a timber company in Idaho to inquire whether it was interested in hiring his daughter to take over his customer list.
*654 Pelican Bay's president, Hanson, discovered Kelley's behavior, and reminded him that the customer list and related information was Pelican Bay's property and not Kelley's. Kelley acknowledged that reminder in writing, signing the following statement:
"I, Doug Kelley, have been reminded today by Ron Hanson, President, of Pelican Bay's Confidentiality Policy which I acknowledged and signed on January 29, 2007. He also reprinted a copy of the policy section we discussed.
"I understand that if I violate this policy, I will be subject to disciplinary action and possible legal recourse.
"The basis of our conversation today is that intangible property such as information and data belongs to Pelican Bay. Examples listed include customer lists, production *421 information, and computer records. I may not disclose or discuss proprietary or confidential information with anyone outside the company. It is understood that once I leave the employ of Pelican Bay, all company information that I gathered while working for Pelican Bay stays here. I may only leave with my personal belongings that I brought to the office."
As he approached his retirement from Pelican Bay, Kelley provided confidential customer information obtained during his employment with Pelican Bay to Hotmer, so that Hotmer could use that information to get hired by Western Timber. Additionally, Kelley agreed to train Hotmer on how to use the customer information to efficiently sell to plaintiff's customers. When Hotmer met with Western Timber for the first time about employment, Western Timber's president, Dan Seid, was interested in adding the customer list that Hotmer had acquired to its book of business. Hotmer later had a second meeting with Seid. Kelley attended that meeting by telephone and provided Seid with further details regarding his customer information from Pelican Bay. Subsequently, Western Timber hired Hotmer because of Hotmer's access to the customer information supplied by Kelley. Western Timber would not have hired Hotmer without possession of the customer information that Kelley supplied him.
Hotmer began working at Western Timber on May 20, 2014. His customer base consisted of the 20 customers obtained through the information provided by Kelley. That same day, while Kelley was still employed by Pelican Bay, Kelley began training Hotmer on how to use the customer list at Western Timber. Kelley provided Hotmer with customer and lumber mill information from plaintiff's customer list, "customer profiles," customer purchasing preferences, shipping preferences, payment habits, information regarding Pelican Bay's outstanding orders, and Pelican Bay's pricing. Kelley assisted Hotmer on sales calls and introduced Hotmer to customers on plaintiff's customer list.
Ten days after Hotmer started with Western Timber, Kelley retired from Pelican Bay. That same day, Kelley met with Hanson and two of Pelican Bay's employees to determine which of Pelican Bay's traders would take over *422 the accounts that had been serviced by Kelley. Kelley did not disclose at that time that he had provided part of his customer list and other information to Hotmer for use at Western Timber.
Within a few days of Kelley's retirement, Pelican Bay learned that Hotmer and Kelley had been using information that Kelley obtained while working for Pelican Bay to lure customers to Western Timber. On June 5, 2014, plaintiff sent cease-and-desist letters to Western Timber, Hotmer, and Kelley, informing them that they had misappropriated Pelican Bay's confidential information, and that they should stop using it immediately. In response to the letter, Western Timber declined to discontinue its use of the information obtained through Kelley. It continued to employ Hotmer and use the customer list because Western Timber did not believe Kelley's confidentiality agreement "would hold up."
Pelican Bay sued, alleging three claims for relief against defendants: misappropriation of trade secrets, intentional interference with economic relations, and conversion.[1] Defendants *655 moved for summary judgment against each of the plaintiff's three claims under ORCP 47, arguing that, viewed in a manner most favorable to plaintiff, no objectively reasonable juror could return a verdict for plaintiff on any of its claims. Defendants' primary argument was that the information at issue was not a trade secret and that Seid, Hotmer, and Western Timber were not Pelican Bay employees and, therefore, were not bound by Pelican Bay's employment policies. They argued, essentially, that, because no trade secrets were at issue, there could be no unlawful misappropriation in violation of ORS 646.461 : "Because plaintiff has no evidence anything is a trade secret, the Western Timber defendants are entitled to summary judgment."
On the conversion claim, defendants argued that, "because plaintiff does not own the information in Kelley's head, there can be no conversion of something plaintiff does not own." Defendants also argued that the conversion claim *423 must fail because defendants have not seriously impaired or prevented plaintiff from using its confidential information to transact business because plaintiff still sells to the customers listed. With respect to the intentional interference with economic relations claim, defendants argued only that, under an Oregon District Court decision, IKON Office Solutions v. American Office , 178 F. Supp. 2d 1154 (D. Or. 2001), aff'd , 61 F. Appx. 378 (9th Cir. 2003), the failure of the alleged trade secret claim necessarily meant that there was no liability for intentional interference with economic relations:
"In IKON the court found (and plaintiff conceded) that if plaintiff did not prevail on the trade secrets claim there was no 'improper means' to support the interference claim. 178 F. Supp. [2d] at 1170. That is the same result here for the same reasons."
In response, Pelican Bay argued that there was evidence that the customer list and related information taken by Kelley and used by defendants qualified as trade secrets, as that term is defined in ORS 646.461(4). In addition, Pelican Bay argued that there was evidence that would support a finding that defendants had misappropriated Pelican Bay's trade secrets under the form of "misappropriation" described in ORS 646.461(2)(d). Pointing out that defendants' motion for summary judgment omitted subsection (d) from its block quotation of ORS 646.461(2), Pelican Bay asserted that, at a minimum, defendants' admission that they continued to use Pelican Bay's customer information after receiving Pelican Bay's cease-and-desist letters would support a finding of misappropriation as defined under ORS 646.461(2)(d)(C), which states that misappropriation occurs when there is "[d]isclosure or use of a trade secret of another without express or implied consent by a person, who at the time of disclosure or use , knew or had reason to know that the knowledge of the trade secret was * * * [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." ORS 646.461(2)(d)(C) (emphasis added). Pelican Bay argued:
"Similarly, the undisputed evidence shows that Western Timber, Hotmer and Seid have also 'misappropriated'
*424 Plaintiff's trade secrets in violation of ORS 646.461(2). Specifically, Defendants admit that Kelley provided Defendants with Plaintiff's confidential customer information. Western Timber admits that it would not have hired Hotmer, who had no previous experience in the industry, without Plaintiff's confidential customer information provided by Kelley to Hotmer. Only days after Kelley's retirement from Plaintiff, on June 5, 2014, Plaintiff's counsel sent letters to each of the Defendants, demanding that Defendants cease and desist from further misappropriation and/or misuse of Plaintiff's confidential customer information. Western Timber admits that it continued to employ Hotmer after Western Timber learned of the confidentiality agreement between Kelley and Plaintiff because Western Timber did not believe the confidentiality agreement between Plaintiff and Kelley 'would hold up.' Hotmer and Western Timber also admit that they have used Plaintiff['s] confidential *656 proprietary information to generate nearly $ 4 million in sales from Plaintiff's customers. Based on the foregoing, Plaintiff has submitted undisputed evidence that Western Timber, Hotmer and Seid 'misappropriated' Plaintiff's trade secrets in violation of ORS 646.461(2)(d). At a minimum, there are genuine issues of material fact that preclude summary judgment in favor of Western Timber, Hotmer, and Seid."
The trial court granted defendants' motion. In explaining its ruling, the court stated that the evidence demonstrated that there was a jury question "as to whether there is or isn't a trade secret," but that Pelican Bay had not produced evidence that would allow a finding that defendants "did anything for improper means." For that reason, the court concluded, all three claims against defendants failed as a matter of law. The court did not address explicitly Pelican Bay's theory that defendants' conduct violated ORS 646.461(2)(d)(C) because it had "used" Pelican's trade secrets when it "knew or had reason to know" that the information supplied by Kelley was "[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." ORS 646.461(2)(d)(C).
Thereafter, defendants petitioned for attorney fees with respect to the trade secrets claim under ORS 646.467(1), asserting that they were entitled to fees under that provision on the ground that the claim had been asserted in "bad *425 faith." Agreeing with defendants on that point, the trial court awarded defendants $ 37,425 in attorney fees. The court then entered a general judgment in favor of all defendants; the judgment included the fee award.
Pelican Bay appeals, seeking reversal of the general judgment and money award. It assigns error to the trial court's grant of defendants' motion for summary judgment on its claims for misappropriation of trade secrets and intentional interference with economic relations.[2] Pelican Bay also assigns error to the court's grant of attorney fees to defendants under ORS 646.467, and the court's failure to consider the factors specified in ORS 20.075 when it granted, in part, defendants' motion for attorney fees. Pelican Bay argues that all that it needed to show in order to defeat summary judgement was evidence that (1) defendants used plaintiff's trade secrets and that (2) defendants knew or had reason to know that their knowledge of plaintiff's trade secrets was derived from or through a person who owed a duty to plaintiff to maintain its secrecy or limit its use, under ORS 646.461 (2)(d)(C). It contends that the trial court overlooked the fact that a person who uses a trade secret can "misappropriate" it within the meaning of ORS 646.461(2) even if the person did not directly "take" the trade secret but, instead, simply used it with the requisite knowledge that it derived from someone who had a duty to keep the secret confidential. Pelican Bay argues further that if we agree with plaintiff that the record gives rise to a dispute of fact as to whether defendants misappropriated Pelican Bay's trade secrets, then we must also reverse the trial court's grant of summary judgment on the intentional interference with economic relations claim and the attorney fee award, because the court's ruling on each of those claims turned on its conclusion that there was no evidence to support a finding of misappropriation.
In response, defendants, in the main, urge us to affirm on an alternative ground: that Pelican Bay's evidence is insufficient to give rise to a factual dispute as to whether the information that Kelley took from Pelican Bay and provided to the defendants qualifies as a "trade secret" within *426 the meaning of ORS 646.461(4). Their primary argument in that regard is that, in their view, this case is "nearly identical" to IKON Office Solutions , 178 F. Supp. 2d 1154, a case in which the district court concluded that the evidence presented was insufficient to create a dispute of fact as to whether the customer lists and information at issue in that case constituted trade secrets for purposes of ORS 646.461(4). Addressing Pelican Bay's argument regarding misappropriation under ORS 646.461(2)(d)(C), defendants argue that there is no evidence to support a finding that they knew or should have known that Kelley had an obligation to keep the information confidential *657 until after they received the cease-and-desist letters. As to their continued use of the information after that time, defendants appear to argue that the cease-and-desist letters are insufficient to support an inference that they knew or should have known that Kelley owed a duty to keep the information confidential because the letters did not use the phrase "trade secret," and "identifie[d] the customer information only as 'confidential' and 'proprietary.' " As to the other claims of error, defendants acknowledge that the trial court's grant of summary judgment on the intentional interference with economic relations claim and the award of attorney fees turned on its conclusion that summary judgment on the trade secrets claim was required, and they do not advance any argument as to why those rulings should be affirmed if the grant of summary judgment on the trade secrets claim is reversed.
STANDARD OF REVIEW
We review the trial court's grant of summary judgment to determine whether there is no genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. ORCP 47 C. That standard is met when, "viewing the evidence in the record and all reasonable inferences that may be drawn from it in favor of the nonmoving party, no reasonable factfinder could return a verdict for the nonmoving party." Chapman v. Mayfield , 358 Or. 196, 204, 361 P.3d 566 (2015). The nonmoving party bears the burden "to produce evidence on any issue raised in *427 the motion as to which the nonmoving party would have the burden of persuasion at trial." Id.
ANALYSIS
Given that the other rulings challenged in this appeal were predicated on the trial court's grant of summary judgment to defendants on Pelican Bay's trade secrets claim, the issue before us is whether the court erred in granting summary judgment on the trade secrets claim. As framed by the parties' arguments on appeal, resolution of that issue turns on whether Pelican Bay's evidence in opposition to summary judgment is sufficient to permit a reasonable factfinder to find (1) that the customer information that Kelley took from Pelican Bay constitutes a "trade secret" under ORS 646.461(4) and (2) that defendants engaged in conduct constituting "misappropriation" under ORS 646.461 (2)(d)(C).[3] We conclude that the evidence in the summary judgment record is sufficient to withstand summary judgment in both respects and that the trial court erred when it determined that Pelican Bay presented insufficient evidence that defendants had misappropriated the information at issue for purposes of ORS 646.461.
We start with the question of whether Pelican Bay's evidence was sufficient to create a factual dispute as to whether the customer information taken and disseminated *428 by Kelley constituted a trade secret. ORS 646.461(4) defines a "trade secret" as follows:
" 'Trade secret' means information, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process that:
"(a) Derives independent economic value, actual or potential, from not being generally *658 known to the public or to other persons who can obtain economic value from its disclosure or use; and
"(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
ORS 646.461(4). In Kaib's Roving R.PH. Agency, Inc. v. Smith , 237 Or. App. 96, 103, 239 P.3d 247 (2010), we elaborated on the meaning of "trade secret" and on the sort of evidence required to give rise to a factual dispute as to whether something is or is not a trade secret:
"To constitute a trade secret under ORS 646.461(4), information (including compilations) must both (1) gain value because it is not generally known and (2) be the subject of reasonable efforts to maintain that secrecy. Each of those determinations is made, not by reference to legal principles, but on the basis of the historical facts and circumstances presented: Is the information at issue generally known within the relevant community? Is it more valuable by virtue of not being generally known? What efforts were made to keep it secret? Were those efforts reasonable? Et cetera. The definition set forth in the statute itself therefore necessarily implies that whether information is or is not a trade secret is a question of fact. If facts and circumstances are presented to establish that the information derives economic value from not being generally known and is subject to reasonable efforts to maintain its secrecy, then the information is a trade secret within the meaning of the statute."
Id . Thus, under Kaib's Roving R.PH. Agency, Inc. , the issue is whether the evidence presented by Pelican Bay, viewed in Pelican Bay's favor, establishes facts and circumstances that would permit a reasonable factfinder to find "that the information derives economic value from not being generally known and is subject to reasonable efforts to maintain its secrecy." Id.
*429 Here, the evidence presented by Pelican Bay meets that standard. First, the evidence would permit a finding that Pelican Bay made reasonable efforts to keep the information confidential. In 2007, Kelley signed an "Employee Acknowledgment" agreeing to abide by the policies contained in plaintiff's handbook, which contained a confidentiality agreement stating that plaintiff's confidential proprietary information, including its customer list, belonged to plaintiff and was not to be shared with third parties. Again, in 2013, after plaintiff learned that Kelley had been attempting to sell the customer information to other traders, plaintiff's president met with Kelley, reminded him of his confidentiality obligations and that the customer information was plaintiff's property, and presented him with a written agreement memorializing their conversation.
The evidence would also permit finding that the information is of the nature that derives economic value from being kept secret. Defendants admitted that the lumber sales business is competitive and that it takes many years to build up a quality book of business. Because of that fact, when Hotmer started working for Western Timber, it had Hotmer sign an agreement that said that the business he was bringing over from Pelican Bay, as well as any new business he acquired, was the property of Western Timber, and that Hotmer did not have authority to sell or transfer the customer information. The fact that Western Timber would not have hired Hotmer but for his access to Kelley's customer information from Pelican Bay also allows for the inference that that information is something that derives economic value from the fact that it is not generally available information.
Resisting that conclusion, defendants point our attention to evidence in the record that would allow a factfinder to reach a different determination regarding the nature of the information that Kelley took from Pelican Bay. As we have acknowledged, this case has been hard fought and the record evidences many factual disputes. But our task is to assess whether there is some evidence in the record that would permit a reasonable factfinder to find that the information taken by Kelley was a trade secret. Because there is, it is for a jury to decide whether or not that *430 information constitutes a trade secret under ORS 646.461(4). See generally Kaib's Roving R.PH. Agency, Inc. , 237 Or. App. at 103, 239 P.3d 247. In a similar vein, defendants *659 also rely heavily on the decision in IKON Office Solutions to argue that summary judgment is as appropriate here as the district court in that case concluded it was there. But the propriety of summary judgment in a given case necessarily turns on the record developed in each case, and, while the record in that case may not have been adequate to demonstrate a factual dispute as to whether the information at issue constituted a trade secret, here, the evidence identified above gives rise to a factual dispute that precludes summary judgment.[4]
Finally, defendants also argue that the information taken by Kelley cannot constitute a trade secret under ORS 646.461(4) because the undisputed facts show that Kelley took that information from Pelican Bay in his head, rather than in a tangible form. In their view, information taken by memory cannot, as a matter of law, constitute a trade secret.
The problem with that argument is that there is no textual support for it in ORS 646.461(4) or elsewhere in the Uniform Trade Secrets Act, ORS 646.461 to 646.475. See ORS 646.475(2) (" ORS 646.461 to 646.475 may be cited as the Uniform Trade Secrets Act."). Simply put, as the Washington Supreme Court and others have recognized in interpreting the Uniform Trade Secrets Act,[5] nothing in the terms of the Uniform Trade Secrets Act suggests that information otherwise constituting a trade secret would lose that status simply because a person is able to take that information in an intangible form. See Ed Nowogroski Ins., Inc. v. Rucker , 137 Wash. 2d 427, 449, 971 P.2d 936, 946-49 (1999) (collecting cases under the Uniform Trade Secrets Act and explaining that "[t]he form of information, whether written or memorized, is immaterial under the trade secrets statute; the Uniform Trade Secrets Act makes no distinction *431 about the form of trade secrets"). Rather, the terms of the act are written broadly so as to safeguard trade secrets, no matter the form in which they may be misappropriated. See generally id. For us to conclude otherwise would, in effect, require us to add a limitation to the Act that the legislature itself has not included. But "[w]e may not insert what the legislature has omitted or omit what the legislature has inserted." State v. Rogers , 330 Or. 282, 290, 4 P.3d 1261 (2000) (citing ORS 174.010 ). We thus agree with the analysis of the Washington Supreme Court and, for that reason, reject the argument that the information taken by Kelley is not a trade secret for purposes of the Uniform Trade Secrets Act simply because he used his memory to take it.
We next address whether the evidence was sufficient to permit a reasonable factfinder to find that defendants misappropriated Pelican Bay's trade secrets under ORS 646.461(2)(d)(C) by continuing to use the information after they received the cease-and-desist letters. Defendants appear to argue only that the evidence is insufficient to permit that finding because the letters did not use the words trade secrets. We reject that argument and otherwise conclude that Pelican Bay's evidence is sufficient to permit a reasonable factfinder to find that defendants "misappropriated" Pelican Bay's confidential customer information within the meaning of ORS 646.461(2)(d)(C).
ORS 646.461(2)(d)(C) defines "misappropriation" as follows:
"(d) Disclosure or use of a trade secret of another without express or implied consent by a person, who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was:
"* * * * *
"(C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]"
Pelican Bay's evidence would permit a reasonable factfinder to find that defendants misappropriated its information in that manner.
*660 That evidence would permit a finding that defendants obtained Pelican Bay's customer list *432 and information from Kelley, who had agreed in writing that he was obligated to Pelican Bay to maintain the list's secrecy and limit its use. When defendants were notified by the cease-and-desist letters that the information supplied by Kelley was confidential and had been misappropriated, defendants continued to use the information to generate sales, even though they had been told expressly that they obtained the information from an individual who had an obligation to plaintiff to maintain the information's secrecy.
Defendants assert that "Plaintiff presented no evidence that Defendants knew or had any reason to know, at the time that they acquired and used the customer information, that Plaintiff considered the customer information a trade secret, that the information had been wrongfully acquired, or that Kelley was violating his contractual obligations to Plaintiff in sharing it." (Emphasis in original.) That may be true. But the fact that defendants may not have been on notice at the time they initially used plaintiff's confidential information simply means that their initial use of the information would not constitute misappropriation. By its terms, however, ORS 646.461(2)(d)(C) provides that misappropriation occurs at any time a person uses a trade secret without the necessary consent when the person knows or should have known that the information was obtained from someone who had an obligation to keep it confidential; that is, whenever there is "[d]isclosure or use of a trade secret of another without express or implied consent by a person, who at the time of disclosure or use , knew or had reason to know that the knowledge of the trade secret was * * * [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." ORS 646.461(2)(d)(C) (emphasis added). That means that once defendants were notified that Kelley had a duty of confidentiality to Pelican Bay, their subsequent use of Pelican Bay's confidential customer lists with that knowledge could have constituted misappropriation as defined by ORS 646.461(2)(d)(C) -or so a reasonable factfinder could find on this record. IMED Corp. v. Systems Engineering Associates Corp. , 602 So. 2d 344, 346-47 (Ala. 1992) (concluding, under Alabama Trade Secrets Act § 8-27-3, that "[i]t would require a tortured reading of the statute for us to conclude * * * that *433 a person cannot be held liable unless he knew or should have known at the time he learned the trade secret that it had been misappropriated by the third person" and that "[t]he purpose underlying the Act would surely be thwarted if a person, although innocently acquiring a trade secret from a third person, could nonetheless disclose or use that trade secret with impunity after being placed on notice that the trade secret had been misappropriated," and observing that its interpretation of its state Act was consistent with section one of the Uniform Trade Secrets Act).
For those reasons, the trial court erred in granting summary judgment to defendants on Pelican Bay's trade secrets claim, and we must reverse as to that claim. As we have explained, the court's grant of summary judgment on the intentional interference with economic relations claim was predicated on the grant of summary judgment on the trade secrets claim; defendants have not argued that summary judgment on that claim would be warranted even if summary judgment on the trade secrets claim is not. Accordingly, having reversed the grant of summary judgment on the trade secrets claim, we also reverse the grant of summary judgment on the intentional interference claim. Finally, we must also reverse the award of attorney fees on the trade secret claim. Because we have reversed the trial court's grant of summary judgment on the trade secrets claim, defendants are no longer prevailing parties for purposes of ORS 646.467.
Reversed and remanded.

Pelican Bay also asserted claims against Kelley. After the trial court denied Kelley's motion for summary judgment, Pelican Bay and Kelley settled. As a result, the claims against Kelley are not at issue on this appeal.

Pelican Bay does not assign error to the grant of summary judgment on its conversion claim.

Although Pelican Bay has not raised the issue, it is not clear to us that defendants' motion for summary judgment put at issue whether Pelican Bay would be able to establish that defendants' conduct constituted "misappropriation" within the meaning of ORS 646.461(2) sufficiently to require Pelican Bay to respond to that point with evidence. Although the motion asserted generally that Pelican Bay would not be able to establish misappropriation, defendants' sole argument on the point was that Pelican Bay would not be able to establish that information taken by Kelley was a trade secret and, thus, without a showing that trade secrets had been taken, Pelican Bay would not be able to show misappropriation of trade secrets. Defendants did not make any developed arguments that, if trade secrets had been taken, those trade secrets nonetheless had not been misappropriated through any of the means described in ORS 646.461(2). As a result, the issue of the sufficiency of the evidence of misappropriation may not have been properly before the court. See Dahlke v. Jubie , 292 Or. App. 804, 809-10, 426 P.3d 138 (2018) (trial court erred by granting summary judgment to party on issue that had not been raised in the party's motion). Regardless, as we explain, the trial court's grant of summary judgment on the issue of misappropriation was erroneous because Pelican Bay supplied evidence that would permit a finding that defendants misappropriated Pelican Bay's trade secrets by continuing to use Pelican Bay's confidential information after receiving the cease-and-desist letter.

We also observe that, at the time it decided IKON Office Solutions , the district court did not have the benefit of our opinion in Kaib's Roving R.PH. Agency, Inc .

The Uniform Trade Secrets Act is a uniform act and the legislature has directed that it "shall be applied and construed to effectuate [the] general purpose to make uniform the law with respect to the subject of ORS 646.461 to 646.475 among states enacting them." ORS 646.475(1).